### INTERNATIONAL TELECOMMUNICATIONS EXCHANGE CORPORATION, Plaintiff,

v.

### MCI TELECOMMUNICATIONS CORPORATION, Defendant.

#### Civ. A. No. 92–cv–1751–FMH.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 31, 1995.

Cary Ichter, James Meadows, Mark Trigg, Meadows, Ichter & Trigg, Atlanta, GA, for plaintiff.

William Barwick, Patricia Anne Gorham, Sutherland & Asbill, Atlanta, GA, for defendant.

### ORDER

HULL, District Judge.

This action is before the Court on (1) Plaintiff's Motion for Partial Summary Judgment [143–1], (2) Defendant's Motion for Summary Judgment [144–1], (3) Plaintiff's Motion for Leave to File a Supplemental Brief [172–1], (4) Defendant's Motion to Strike Affidavit [186–1], (5) Defendant's Motion for Expenses [186–2], (6) Defendant's Motion for Attorney Fees [186–3], and (7) Plaintiff's Motion to Require MCI to Show Cause Why It Should Not Be Held in Contempt [194–1].

### I. FACTUAL BACKGROUND

Defendant MCI Telecommunications Corporation ("MCI") is a long distance telecommunications carrier. Defendant MCI provides long distance telecommunications services to individual and corporate users. Plaintiff International Telecommunications Exchange Corporation ("Intex/Delaware") is a reseller of long distance telephone services. Plaintiff Intex–Delaware enters into bulk purchase agreements with major long distance telecommunications carriers, such as MCI, to acquire access to those carriers' long distance telephone networks. Plaintiff Intex/Delaware receives a discount on the long distance time that Plaintiff purchases due to the large volume it acquires. Plaintiff Intex/Delaware resells the long distance time, at a higher rate, to small and medium sized businesses. This action concerns an agreement between Defendant MCI and Plaintiff Intex/Delaware involving the sale of long distance time.

Plaintiff Intex/Delaware is one of three companies originally owned by Douglas and Deborah Wilcox (the "Wilcoxes"). On September 9, 1989, the Wilcoxes registered the first of the three corporations that composed the Intex corporations. That first corporation was known as National Access Telecommunications Corporation ("NATC") in California. In June, 1990, NATC changed its name to International Telecommunications Exchange Corporation, but remained a California corporation ("Intex/California").

On September 28, 1990, the Wilcoxes formed the two other corporations in the Intex trio, Intex Services, Inc. and Intex Communications Group, Inc. Intex Services was created to service large national accounts with which Intex/California would establish a relationship. Intex Communications Group was intended to become the parent of Intex Services and Intex/California.

In March, 1991, Intex Communications Group, Inc., a Delaware corporation, changed its name to International Telecommunications Exchange Corporation, but remained a Delaware corporation. There were now two corporations created by the Wilcoxes that were named International Telecommunications Exchange Corporation. The first International Telecommunications Exchange Corporation was a California corporation, i.e. Intex/California. The second International Telecommunications Exchange Corporation was a Delaware corporation, i.e. Intex/Delaware. The Plaintiff in this case is the second of the two companies named International Telecommunications Exchange Corporation, and is referred to in this Order as Intex/Delaware.

On or about November 16, 1990, Intex/California entered into a Special Customer Agreement (the "SCA") with Defendant MCI. Pursuant to the SCA, Defendant MCI was to provide certain long distance telecommunications services to Intex/California. Intex/California would then re-sell these same long distance services to its customers at a higher rate. Under the terms of the SCA, Intex/California was to provide an agreement whereby a third party would guarantee payment for a portion of the services Intex/California received from Defendant MCI.

To fund the initial cost of Intex/California, the Wilcoxes borrowed large amounts of money. Among the individuals who loaned money to Intex/California were Chin–Shin Chen and Samuel Chen (the "Chens").

Despite the Wilcoxes' efforts, Intex/California was unable to obtain a guarantee from Chrysler First Financial Corporation ("CFFC"), as required in the SCA.[1] By the beginning of 1991, the Wilcoxes were in danger of default under the terms of the Wilcoxes' loan agreement with the Chens. On January 7, 1991, the Wilcoxes and the Chens entered into a forbearance agreement, whereby the Chens agreed to forbear foreclosure upon Intex/California until February 15, 1991 in exchange for certain valuable consideration. The Wilcoxes and the Chens agreed that the Chens could foreclose upon Intex/California if the Wilcoxes failed to perform under the January 7, 1991 forbearance agreement. On February 8, 1991, the Chens' counsel informed the Wilcoxes that the Chens intended to enforce their rights under the forbearance agreement and foreclose upon Intex/California.

In early February 1991, John Paul DeJoria was approached by the Wilcoxes and agreed to invest in Intex/Delaware. DeJoria's initial investment consisted of a $350,000 loan and two $500,000 letters of credit. The two letters of credit were used to satisfy the SCA's requirement that Intex provide a guarantee agreement.[2] Up to this point, the parties agree as to the above recited facts. The parties dispute, however, the events beginning in early February, 1991. One of the principal factual disputes between the parties is whether Plaintiff Intex/Delaware has standing to sue Defendant MCI for breach of the SCA, when both parties agree that the original signatories to the SCA were Defendant MCI and Intex/California, not Intex/Delaware.

It is undisputed that Defendant MCI continued to provide telecommunications services pursuant to the SCA until June, 1992. Plaintiff Intex/Delaware claims that the SCA was assigned by Intex/California to Intex/Delaware and that Plaintiff Intex/Delaware continued to perform Intex/California's obligations under the SCA. However, Defendant MCI disputes whether an assignment occurred and whether Intex/Delaware or Intex/California was performing under the SCA.

Plaintiff Intex/Delaware also claims that Defendant MCI was aware of Plaintiff's performance of the SCA. Plaintiff alleges that, despite Plaintiff Intex/Delaware's performance of the SCA, Defendant MCI decided that the SCA was undesirable and began a campaign to rid itself of Intex/Delaware and the SCA. According to Plaintiff Intex/Delaware, Defendant MCI's attempts to break the SCA resulted in Defendant MCI's unilateral breach of the SCA, and certain harm to Plaintiff Intex/Delaware. Plaintiff Intex/Delaware seeks, among other things, recovery for damages incurred as a result of Defendant MCI's purported failure to render services that Defendant MCI allegedly was obligated to provide under the SCA, and recovery for MCI's allegedly improper termination of the SCA.

Defendant MCI paints a different picture of the events surrounding the SCA. As stated above, both parties agree that Defendant MCI and Intex/California entered into the SCA. Defendant MCI contends, however, that the SCA was never assigned or otherwise validly transferred from Intex/California to Plaintiff Intex/Delaware, and that Intex/Delaware began performing the SCA as an imposter of Intex/California. Defendant MCI also alleges that Plaintiff Intex/Delaware misrepresented to Defendant MCI that Plaintiff was the original signatory to the SCA.

Defendant MCI also claims that even if Plaintiff Intex/Delaware has standing to enforce the SCA, the only enforceable obligations that Defendant MCI has are listed in the SCA and Defendant MCI did not breach any of its obligations under the SCA. Defen-

---

1. Under the SCA, Intex/California was to provide a line of credit with Chrysler First Financial Corporation ("CFFC"), whereby CFFC would prepay a portion of Intex/California's estimated bill for the next month, and CFFC would pay Intex/California's bill for the previous month.

2. The parties dispute what was done with the $350,000 that DeJoria invested.

dant MCI also alleges that Plaintiff Intex/Delaware owes Defendant MCI over two million dollars for various telecommunication services provided by Defendant to Plaintiff.

Plaintiff Intex/Delaware brings this action claiming that Defendant MCI is liable to Plaintiff for MCI's breach of various contractual obligations under the SCA. In Counts One and Two of its Amended Complaint, Plaintiff alleges that Defendant MCI violated the Communications Act of 1934, specifically 47 U.S.C. § 201(b) and 47 U.S.C. § 202(a). In orders dated October 15, 1993, and May 9, 1994, Judge Robert H. Hall, United States District Judge for the Northern District of Georgia, ceded jurisdiction over Counts One and Two to the Federal Communications Commission (the "FCC").[3] In Count Three of its Complaint, Plaintiff alleges that Defendant MCI overbilled Plaintiff in violation of 47 U.S.C. § 203(c).[4]

Counts Four through Seven of Plaintiff's Complaint allege claims under state law. In Count Four,[5] Plaintiff Intex/Delaware alleges that Defendant MCI breached the SCA. In Count Five, Plaintiff alleges that Defendant MCI breached its duty of implied duty and good faith. In Count Six, Plaintiff alleges that Defendant tortiously interfered with Plaintiff's contractual and business relations. In Count Seven, Plaintiff seeks attorney fees because "MCI has acted in bad faith, has been stubbornly litigious, and has caused INTEX unnecessary trouble and expense." Second Amended Complaint, ¶ 60 [121–1].

Defendant MCI filed a five count Counterclaim. In Count One of its Counterclaim, Defendant MCI alleges that Plaintiff Intex/Delaware fraudulently misrepresented itself as Intex/California. In Count Two, Defendant MCI alleges, as an alternative count to Count One, that if Plaintiff Intex/Delaware is the same legal entity as Intex/California, then Plaintiff owes Defendant for services rendered pursuant to the SCA. Included in Count Two are Defendant MCI's prayer for

underutilization penalties that Defendant MCI claims Plaintiff owes pursuant to the SCA. In Count Three, Defendant MCI alleges, regardless of whether Intex/Delaware and Intex/California are the same entity, that Plaintiff Intex/Delaware owes Defendant money for services provided pursuant to the SCA. In Count Four, Defendant MCI alleges that John Paul DeJoria, the owner of Intex/Delaware, fraudulently induced Defendant MCI not to draw upon the one million dollar letter of credit. Defendant MCI alleges that due to DeJoria's false representations, Defendant MCI suffered monetary harm "in an amount not less than $100,000." Defendant MCI's Second Amended Counterclaim, ¶ 47 [122–2]. In Count Five, Defendant MCI also seeks recovery for attorney fees for Plaintiff's alleged "bad faith" and "bad and litigious" behavior.

Defendant MCI moves for summary judgment on all counts in Plaintiff's Complaint. Defendant MCI also moves for summary judgment on Counts Two and Three of its Counterclaim where MCI alleges that Plaintiff owes Defendant MCI for services performed. Plaintiff Intex/Delaware moves for partial summary judgment on the following claims in Defendant MCI's Counterclaim: (1) the fraud claim in Count One, (2) the underutilization penalty claim in Count Two, and (3) the fraud claim in Count Four.

## II. *PLAINTIFF INTEX/DELAWARE'S MOTION FOR LEAVE TO FILE A SUPPLEMENTAL BRIEF*

Plaintiff Intex/Delaware complains that Defendant MCI raises new grounds for summary judgment in Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment. After review of Defendant's Reply, the Court agrees that Defendant raises new grounds for summary judgment in parts of its Reply Brief. In other portions, however, Defendant merely replies to defenses raised by Plaintiff.

---

**3.** This action was originally assigned to Judge Hall. On May 27, 1994, this action was reassigned to the undersigned judge.

**4.** In his September 21, 1993 Order, Judge Hall retained jurisdiction over this claim.

**5.** Plaintiff has labeled the third and fourth claims of its Second Amended Complaint as "Count III." Since Plaintiff's first contract claim is its fourth claim in the Complaint, the Court will refer to this count as Count Four and number each subsequent count one higher, e.g. Count IV of Plaintiff's Second Amended Complaint is really Count Five.

Normally, a party may not raise new grounds for granting its motion in a reply. Where a party does raise new grounds in its reply, the Court may either strike the new grounds or permit the nonmoving party additional time to respond to the new argument. Here, the Court finds that the latter course is appropriate. Therefore, the Court **GRANTS** Plaintiff's Motion for Leave to File a Supplemental Brief. The Court will consider Plaintiff's Supplemental Brief.

The Court recognizes that Defendant requests the opportunity to respond to Plaintiff's Supplemental Brief. The Court will consider Plaintiff's Supplemental Brief because it, in part, is Plaintiff's first opportunity to respond to issues first raised in Defendant's Reply. The Court declines to begin again a briefing schedule that should have ceased upon the filing of Defendant MCI's Reply Brief in Support of its Motion for Summary Judgment. Defendant's own conduct in raising new grounds for summary judgment in Defendant's Reply necessitates Plaintiff's Supplemental Brief on those grounds, but not further briefing. The Court finds that all issues raised in all Motions have been briefed adequately by all parties. Therefore, the Court **DENIES** Defendant MCI's request to reply to Plaintiff's Supplemental Brief.

### III. *SUMMARY JUDGMENT STANDARD*

Federal Rule of Civil Procedure 56(c) defines the standard for summary judgment as follows: courts should grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The general rule of summary judgment in the Eleventh Circuit states that the moving party must show the court that no genuine issue of material fact should be decided at trial. *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 606–09 (11th Cir.1991). Unless the movant for summary judgment meets its burden under Federal Rule of Civil Procedure 56, the

obligation of the opposing party does not arise even if no opposing evidentiary material is presented by the party opposing the motion. *Clark,* 929 F.2d at 607–08.

While all evidence and factual inferences are to be viewed in a light most favorable to the nonmoving party, *Rollins v. Tech-South, Inc.,* 833 F.2d 1525, 1529 (11th Cir. 1987); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250, 106 S.Ct. at 2511. Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case. *Id.* at 248, 106 S.Ct. at 2510.

Where neither party can prove either the affirmative or the negative of an essential element of a claim, the movant meets its burden on summary judgment by showing that the opposing party will not be able to meet its burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). In *Celotex,* the Supreme Court interpreted Federal Rule of Civil Procedure 56(c) to require the moving party to demonstrate that the nonmoving party lacks evidence to support an essential element of its claim. Thus, the movant's burden is "discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

### IV. *DEFENDANT MCI's MOTION FOR SUMMARY JUDGMENT ON COUNTS FOUR AND FIVE OF PLAINTIFF INTEX/DELAWARE'S COMPLAINT* [6]

As detailed above, Defendant MCI moves for summary judgment on all counts of Plain-

---

**6.** The Court notes that although Defendant MCI moved for summary judgment on all counts of Plaintiff's Complaint, Defendant did not brief

why summary judgment is appropriate on Count Seven of Plaintiff's Complaint. Therefore, the Court **DENIES** Defendant's Motion for Sum-

tiff Intex/Delaware's Complaint, and for summary judgment on Count Two of Defendant MCI's Counterclaim. The Court first addresses Defendant MCI's Motion for Summary Judgment regarding Plaintiff Intex/Delaware's claims for breach of contract as alleged in Counts Four and Five of Plaintiff's Complaint.

In Count Four of its Complaint, Plaintiff alleges breach of contract, based on Defendant's purported failure to provide certain services necessary for the performance of the SCA, and for Defendant's alleged improper termination of the SCA. In Count Five of its Complaint, Plaintiff alleges breach of an implied covenant of good faith and fair dealing, based upon Defendant's alleged breach of its contractual duties discussed in Count Four. Defendant moves for summary judgment on both of these counts on numerous grounds.

### A. *Choice of Law Under the SCA*

The SCA provides that the substantive law of New York applies to the SCA, as follows:

[t]his Agreement, including all matters relating to the validity, construction, performance and enforcement thereof, shall be governed by the laws of the State of New York without giving reference to its principles of conflicts of laws.

SCA, ¶ 18. "Absent a contrary public policy, [Georgia courts] will normally enforce a contractual choice of law clause." *Carr v. Kupfer,* 250 Ga. 106, 107, 296 S.E.2d 560 (1982); *Kinnick v. Textron Financial Corp.,* 205 Ga. App. 429, 429, 422 S.E.2d 303 (1992). The Court finds that application of the parties' contractual choice of law is not contrary to Georgia's public policy. Therefore, the substantive law of New York applies to certain issues in this case.

 State choice of law provisions do not bar the applicability of federal law to certain provisions in the SCA. The SCA incorporates MCI Tariff FCC No. 1 (the "MCI Tariff" or the "Tariff") and expressly provides that Intex understands that in conducting its business under the SCA, MCI is subject to the Federal Communications Act of 1934, as amended, applied and interpreted

by the FCC. The Eleventh Circuit recognizes that contracts involving federally regulated entities that contain state choice of law provisions do not bar the applicability of federal law to the parties' relationship. As was stated in *Atkinson v. General Elec. Credit Corp.,* 866 F.2d 396 (11th Cir.), *cert. denied,* 493 U.S. 815, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989),

providing that a contract is to be governed by "state law does not signify the inapplicability of federal law, for a fundamental principle in our system of complex national polity mandates that the Constitution, laws, and treaties of the United States are as much a part of the law of every State as its own local laws and Constitution."

*Id.* at 398 (quoting *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 157, 102 S.Ct. 3014, 3024, 73 L.Ed.2d 664 (1982)). Federal law applies to the applicable MCI Tariff, except where the SCA contradicts the Tariff. New York law governs the general contract terms in the SCA, except for the Tariff and the specific SCA contract terms that contradict the Tariff.[7]

### B. *Capacity to Sue*

Defendant MCI's first ground for summary judgment on Plaintiff Intex/Delaware's contract claims is that Plaintiff does not have standing to enforce the SCA. Defendant contends that Plaintiff is not a party to the SCA, and, thus, lacks the capacity to sue to enforce the SCA. Defendant argues that Intex/California was the only signatory to the SCA and Intex/California never assigned or otherwise validly transferred the SCA to Plaintiff Intex/Delaware. Plaintiff Intex/Delaware responds that it does have standing to enforce the SCA. To support its position, Plaintiff contends that Intex/California assigned the SCA to Plaintiff Intex/Delaware. Plaintiff also argues that under the facts in this action either a novation occurred, or Defendant MCI ratified the change in parties or has waived any objection to the performance of the SCA by Plaintiff Intex/Delaware.

---

mary Judgment on Count Seven of Plaintiff's Complaint.

7. As discussed *infra,* the result reached on Plaintiff's breach of contract claims is the same, whether the Court applies New York or federal law.

### 1. Assignment of the SCA

There is no evidence that there was a written assignment of the SCA from Intex/California to Intex/Delaware. Plaintiff contends, however, that an oral assignment occurred. Plaintiff's first hurdle is a non-assignment clause in the SCA.

■ The SCA contains a clause that limits a party's ability to assign the SCA. Specifically, the SCA non-assignment clause states that assignments of the SCA are not permitted unless Defendant MCI is provided notice, as follows:

> [t]his Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns; provided, however, that Customer may not assign or otherwise transfer this Agreement or any of its interest herein without the prior and express written consent thereto by MCI. Notwithstanding the foregoing, Customer may assign this Agreement to its wholly-owned subsidiary upon notice to MCI provided the assignee's financial strength is equal to or greater than that of Customer, and further provided that Customer shall remain responsible for full performance of this Agreement. Neither the whole nor any part of the interest of Customer in this appointment shall be transferred or assigned by operation of law.

SCA, at ¶ 17. Plaintiff contends that while the non-assignment clause restricts Intex/California's right to assign the SCA, an assignment to another entity is not void under the particular phraseology of this non-assignment clause.

■ Under New York law, a non-assignability clause is treated as a personal covenant that does not invalidate an otherwise proper transfer, unless the clause states specifically that any assignment shall be void, as follows:

> "[a] basic rule of construction of nonassignability clauses is that in the absence of language explicitly barring assignment of a contract right so as to provide that any assignment of it shall be void, a clause prohibiting assignment will be interpreted as a personal covenant not to assign. Thus, a breach of covenant not to assign creates a right in the contract-obligee to

recover against the obligor-assignor any damage suffered by reason of the assignment, but it does not affect the transfer of contract rights to the assignee.

*Belge v. Aetna Cas. & Sur. Co.,* 39 A.D.2d 295, 334 N.Y.S.2d 185, 187 (1972) (citations omitted); *see also Citibank, N.A. v. Tele/Resources, Inc.,* 724 F.2d 266, 268 (2d Cir.1983); *Goldring v. Sletco Realty, Inc.,* 129 Misc.2d 756, 494 N.Y.S.2d 56, 58 (1985); *University Mews Assocs. v. Jeanmarie,* 122 Misc.2d 434, 471 N.Y.S.2d 457, 461 (1983).

The Court agrees with Plaintiff's position. Under New York law, the non-assignment clause of the SCA removed Intex/California's right to assign the SCA, but did not eliminate the power to assign the SCA. *See, e.g., Belge v. Aetna Cas. & Sur. Co.,* 39 A.D.2d 295, 334 N.Y.S.2d 185, 187–88 (1972); *University Mews Assocs. v. Jeanmarie,* 122 Misc.2d 434, 471 N.Y.S.2d 457 (1983). Therefore, the assignment, if in fact it occurred, is valid despite the non-assignment clause contained in the SCA.[8] The Court now addresses whether Intex/California validly assigned the SCA to Plaintiff Intex/Delaware.

■ Under New York law, only a party to the contract may enforce the terms of the contract. *Empire Volkswagen, Inc. v. World–Wide Volkswagen Corp.,* 627 F.Supp. 1202, 1212 (S.D.N.Y.1986), *aff'd,* 814 F.2d 90 (2d Cir.1987); *Crown Wisteria, Inc. v. F.G.F. Enterprises Corp.,* 168 A.D.2d 238, 562 N.Y.S.2d 616, 618 (1990). Plaintiff Intex/Delaware claims that Intex/California orally assigned the SCA to Plaintiff. In New York, "[t]he use of the word 'assign' is not essential to effect a valid assignment." *Banque Arabe et Int'l D'Investissement v. Bulk Oil (USA), Inc.,* 726 F.Supp. 1411, 1417 (S.D.N.Y.1989) (quoting *In re Boissevain's Estate,* 40 Misc.2d 237, 243 N.Y.S.2d 36, 43 (1963)). Instead, " 'any act or words are sufficient which show an intention of transferring the chose in action to the assignee, when the assignor is divested of all control and right to cause of action and the assignee is entitled to control it and receive its fruits.' " *Id.* (quoting *Advance Trading Corp. v. Nydegger &*

---

**8.** The Court also notes that there is some question whether Defendant MCI even has standing to challenge the validity of any assignment. *Belge,* 334 N.Y.S.2d at 188.

*Co. Inc.,* 127 N.Y.S.2d 800, 801 (N.Y.Sup.Ct. 1953)).

 In this case, Defendant MCI offers the affidavit of Douglas Wilcox, the major shareholder and officer of Intex/California, who states that the SCA was never transferred, as follows:

During the time in which I was an officer and shareholder in INTEX, the California corporation, to my [sic], that corporation never assigned its SCA with MCI to Intex Communications Group, Inc., or to any other corporation or entity. I never advised anyone at MCI that Intex Communications Group, Inc., the Delaware corporation, was a party to the SCA or that it executed the SCA. I also never made any similar statements to Stephen Fingal or Dennis Menke.

Douglas Wilcox affidavit of May 27, 1994, attached to Defendant MCI's Motion for Summary Judgment.

In response to Wilcox's May 27, 1994 affidavit, Plaintiff Intex/Delaware offers another affidavit of Wilcox's. The Wilcox affidavit submitted by Plaintiff is dated May 7, 1994.[9] In his May 7, 1994 affidavit, Wilcox does not state that he signed a document assigning the SCA to Intex/Delaware. Wilcox does state, however, that it was his intention to "place" the SCA in Intex/Delaware, as follows:

Soon after Mr. DeJoria became involved in the transaction, Mr. Menke, who was now a stockholder, director, and member of the executive committee, along with Stephen Fingal, the corporate attorney for INTEX of California, met with me and told me of the fact that Mr. DeJoria wished to operate through a Subchapter S corporation so that he would be able to use the tax advantages of some of the losses that INTEX was incurring. Mr. Menke told me that INTEX of California had six (6) classes of

stock, which he said legally disqualified it from converting to a Subchapter S corporation, and that INTEX Communications Group, the Delaware corporation, had a single class of shares and could easily elect Subchapter S status. Therefore, Mr. Menke and Mr. Fingal advised me that I should inform MCI that the SCA actually had been executed by the Delaware corporation rather than by INTEX of California. I did not do so, although I advised Ray McBride to tell MCI, through Ben Ditta, that we had the full intention to put the SCA in INTEX Communications Group. The placement of the MCI SCA into the Delaware corporation was not intended to defraud creditors of either corporation, nor was it intended to injure or defraud MCI in any way.

When I instructed Mr. McBride to tell MCI that INTEX of California wanted to put the SCA into the Delaware corporation, and that the Executive Committee had decided to do so, he indicated that he would do so.

May 7, 1994 affidavit of Wilcox, at ¶ 9, 10, exhibit D of Plaintiff's Statement of Material Facts. Examining the two Wilcox affidavits, it is unclear whether an assignment occurred or did not occur. Wilcox expressly states that he intended to assign the SCA to Intex/Delaware, but never actually followed through with the assignment. Wilcox also states that the Executive Committee decided to transfer the SCA into Intex/Delaware, and Wilcox refers to the "placement" of the SCA, thereby suggesting in the past tense that the transfer occurred.

Plaintiff Intex/Delaware does not rest its assignment argument on Wilcox's affidavit alone. Plaintiff contends that other evidence in the record demonstrates that the SCA was assigned to Intex/Delaware. Specifically,

---

9. Plaintiff contends that the Wilcox affidavit it submits is really dated June 7, 1994, instead of the May 7, 1994 date above the notary public's signature line. Plaintiff supports its position by directing the Court's attention to the date line on the top of each page that is purportedly left by a facsimile machine. Plaintiff has not cited any authority, nor is the Court aware of any, for the proposition that the date left by a fax machine is the proper date of an affidavit, instead of the sworn date on the actual affidavit. Therefore,

the Court will treat Plaintiff's Wilcox affidavit as having been signed on May 7, 1994.

The importance of the date on Plaintiff's Wilcox affidavit is presumably that the more recent statement by Wilcox carries the greater evidentiary weight. In any event, the Court will consider both affidavits and consider Wilcox's statements in the context of Defendant's Motion for Summary Judgment, and determine whether a genuine issue of material fact exists.

Plaintiff contends that Scott McBride, senior vice-president for marketing and sales for Intex/California and Intex/Delaware, stated that the Wilcoxes were going to use Intex/Delaware to perform the SCA, as follows:

[t]he Wilcoxes told me that their intentions were to use the International Telecommunications Group or Intex Communications Group Corporation which was formed in September of '90, they were going to change the name to International Telecommunications Exchange Corporation and use it as the vehicle for carrying out the SCA and their ongoing business endeavors.

McBride Deposition II, at 26–7. Additionally, Plaintiff cites the deposition testimony of John Allen, the Chief Financial Officer of both Intex/California and Intex/Delaware, where Allen states that the decision was made that Intex/Delaware would perform the SCA, as follows:

Q: The decision was made that the MCI contract would be performed by the Delaware corporation; correct?

A: Yes.

Q: And that was based upon a decision that Mr. Wilcox made; correct?

A: Well, based upon, at least, his input. Again, as I've said earlier, he did not make that kind of decision solely on his own.

*See* John Allen Deposition, at 79. Additionally, it is undisputed from the record, as currently presented, that Intex/Delaware began performing the SCA.

In short, genuine issues of material fact remain to be tried regarding whether Intex/California assigned the SCA to Plaintiff Intex/Delaware. After careful consideration of the record, and taking all evidence and factual inferences in the light most favorable to the non-moving party, the Court finds that, on the record to date, Defendant MCI has not carried its burden to show as a matter of law that no assignment occurred and that Plaintiff Intex/Delaware lacks capacity to enforce the SCA.

 2. *Ratification and Waiver* [10]

 In opposing Defendant MCI's Motion for Summary Judgment, Plaintiff In-

tex/Delaware also contends that it has capacity to enforce the SCA by virtue of ratification of the SCA by Defendant, or by Defendant's waiver of any objection to Plaintiff Intex/Delaware's performance of the SCA.

 Waiver requires "(1) the existence at the time of the waiver of a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage, or benefit." *Highland Ins. Co. v. Trinidad & Tobago (BWIA Int'l Airways),* 739 F.2d 536, 537 (11th Cir.1984) (citations omitted). Waiver may be express or implied. *200 East 87th Street Assoc. v. MTS, Inc.,* 793 F.Supp. 1237 (S.D.N.Y.), *aff'd,* 978 F.2d 706 (2d Cir. 1992). The intent to waive a right, however, " 'must be clearly established and cannot be inferred from doubtful or equivocal acts or language, and the burden of proof is on the person claiming the waiver of the right.' " *Id.* (quoting *East 56th Plaza, Inc. v. Abrams,* 91 A.D.2d 1129, 458 N.Y.S.2d 953, 955 (1983).

 Under New York law, ratification occurs where a party to a contract acts in a manner to affirm whatever change has occurred in the contract that would otherwise permit the party to void the contract, as follows:

[w]hen a party with full knowledge, or with sufficient notice of his rights and of *all the material facts,* freely does what amounts to a recognition or adoption of a contract or transaction as existing, or acts in a manner inconsistent with its repudiation, and so as to affect or interfere with the relations and situation of the parties, he acquiesces in and assents to it and is equitably estopped from impeaching it, although it was originally void or voidable.

*Corning Glass Works v. Southern New England Telephone Co.,* 674 F.Supp. 999, 1013 (W.D.N.Y.1987) (quoting *Rothschild v. Title Guarantee and Trust Co.,* 204 N.Y. 458, 97 N.E. 879 (1912)).

Several issues of material fact exist in the record regarding whether Defendant MCI

---

10. The Court's ruling regarding the assignment of the SCA pretermits a discussion of Plaintiff's theory of novation.

either ratified the SCA with Intex/Delaware as the performing party or waived any objection to Intex/Delaware's performance of the SCA. For example, a March, 1991 document, entitled "Indemnity and Interim Facilitating Agreement," identifies Intex/Delaware as one of the entities that would perform the SCA. Defendant's alleged knowledge of that fact is supported by that same Indemnity and Interim Facilitating Agreement because Defendant's finance director, McCumber, who did most of the due diligence work on the SCA, has handwritten notes on that agreement. There is also testimony from Plaintiff's Menke that he and MCI's McCumber discussed the fact that Intex/Delaware would perform the SCA. Whether MCI had knowledge that the SCA was being performed by Intex/Delaware, and, thus, should be bound by continuing to act under the SCA with Intex/Delaware, remains a disputed factual issue.[11]

### C. *Count Four: Plaintiff's Breach of Contract Claims Against Defendant*

As a result of the above finding, the Court will assume, *arguendo,* that Plaintiff Intex/Delaware has standing to enforce the SCA and proceed to determine whether Defendant MCI's Motion for Summary Judgment should be granted on Plaintiff's claims in Count Four that Defendant breached its contractual obligations. Specifically, Plaintiff contends (1) that Defendant MCI failed to perform certain services that Defendant was to provide to Plaintiff, and (2) that Defendant improperly terminated the SCA.

As its first ground for breach of contract, Plaintiff alleges that Defendant promised to perform and failed to perform the following services:

(1) MCI failed to take the steps necessary to ensure that Intex/Delaware customers were actually on-line after receipt from Intex/Delaware of information necessary to connect the customer,

(2) MCI failed to provide Intex/Delaware with timely reports of ANIs that had been rejected by the LEC,

(3) MCI failed to provide Intex/Delaware with LEC confirmation of PIC changes,

(4) MCI failed to provide Intex/Delaware with other information necessary for Intex/Delaware to validate and reconcile its account base,

(5) MCI unreasonably delayed submitting billing tapes to Intex/Delaware which caused delays in billing and other damages to Intex/Delaware, and

(6) MCI failed to notify Intex/Delaware of the existence of the "Q" accounts on a timely basis and upon notification, failed to provide appropriate billing records on a timely basis.

Plaintiff's Second Amended Complaint, at ¶ 46. Plaintiff contends that by failing to perform the above services, Defendant is liable for breach of contract. Defendant seeks summary judgment on Plaintiff's claims, contending (1) that Defendant is not contractually obligated to provide these services because the SCA, and the Tariff incorporated therein, are the entire agreement between the parties and the SCA and the Tariff do not reference or require Defendant to perform any of the above services, and (2) that since neither the SCA nor the Tariff requires Defendant to provide any of the above services, Plaintiff's claims are barred by the Filed Tariff Doctrine.

The Special Customer Agreement, referred to as the "SCA," is in the form of a letter agreement. The SCA expressly incorporates the MCI Tariff and expressly provides that MCI will provide services to Plaintiff pursuant to the SCA and the tariffs governing such services, as follows:

November 16, 1990

International Telecommunications Exchange Corporation

Suite 600, Republic Center

Chattanooga, Tennessee 37450

Attention: Mr. Doug Wilcox
Chairman of the Board

Subject: Agreement for Telecommunications Services

Reference: MCI Tariff FCC No. 1, As Filed and Effective

Dear Mr. Wilcox:

---

**11.** The Court finds that on the record presented, a finding that a transfer of the SCA was a fraudulent conveyance as a matter of law is not warranted.

This letter constitutes an agreement for telecommunications service between MCI Communications Corporation ("MCI") and International Telecommunications Exchange Corporation ("Customer").

MCI will provide to Customer, and Customer will receive from MCI, interstate service(s), intrastate service(s), and international services *pursuant to this Agreement and MCI's tariffs governing such services.* This agreement incorporates by reference the terms of MCI Tariff No. 1 ("Tariff") on file with the Federal Communications Commission, which Tariff may be modified from time to time by MCI in accordance with law and thereby affect the service(s) furnished Customer, except that the following terms and conditions shall supplement or, to the extent inconsistent, supersede Tariff terms and conditions and shall remain in effect throughout the service term.

November 16, 1990 Special Customer Agreement (Emphasis supplied).

 As to item one above in Plaintiff's list of breaches, Plaintiff's allegation that Defendant failed to "provision service" for "6,270 ANIs" is arguably encompassed under number one of Plaintiff's list of services that Defendant allegedly failed to provide. As described in Plaintiff's Supplemental Brief, "MCI's fundamental breach of the SCA was its failure to provide the telecommunications services it agreed to supply to Intex, which would then be passed on to Intex's customers.... Intex is seeking to recover damages for 6,270 ANIs [Automatic Number Identifiers] for which MCI failed to provision service." Plaintiff Supplemental Brief, at 5–6. The Court finds that there are genuine issues of material fact as to whether MCI failed to take steps at times necessary to connect customer service in this regard. This service is provided for in the SCA and the Tariff incorporated therein.

Therefore, the Court **DENIES** Defendant MCI's Motion for Summary Judgment on Plaintiff's breach of contract claim described in item one above.[12]

As to Plaintiff's breach of contract claims described in items two through six above, both parties appear to agree, or if not the Court finds, that these services are not covered by the written terms of the SCA or the Tariff. Plaintiff appears to allege (1) that these services are terms of a separate oral contract between Plaintiff and Defendant, or (2) that these services are a valid oral modification of the SCA, or (3) that these services are admissible parol evidence to define ambiguous terms in the SCA. Each argument is without merit.

 First, the SCA contains two merger clauses. "A subsequent written agreement lucidly manifest[ing] the parties' intent that the written agreement supersede" any oral agreement, and that it "constitute[s] the entire agreement between the parties," will preclude inquiry into any prior or contemporaneous agreements between the parties. *Doherty v. New York Tel. Co.,* 202 A.D.2d 627, 609 N.Y.S.2d 306, 307 (1994). Defendant contends that the SCA was the complete agreement between Defendant MCI and Plaintiff.

The first merger clause in the SCA provides that the parties to the SCA understand that the SCA, along with the appropriate MCI tariffs, is the complete agreement between the parties, as follows:

[t]his agreement together with the appropriate MCI tariffs is the complete agreement of the parties and supersedes all other prior agreements and representations concerning its subject matter.

SCA, ¶ 11.

The next paragraph in the SCA provides that the SCA is the whole agreement be-

---

**12.** In attempting to avoid summary judgment on its contract claims, Plaintiff cites the Court to *In re Chateaugay Corp.,* 116 B.R. 887 (Bankr. S.D.N.Y.1990) and *Computerized Radiological Services, Inc. v. Syntex Corp.,* 595 F.Supp. 1495 (E.D.N.Y.1984). Neither case is helpful. *In re Chateaugay Corp.,* involves a bankruptcy court in the Southern District of New York applying Pennsylvania law. *In re Chateaugay Corp.,* 116 B.R. at 902 n. 10. Here the Court is applying

New York law to questions involving the SCA. Plaintiff cites *Computerized Radiological* for the proposition that where a contract refers to another document, then the parties do not intend for the document to be a complete and exclusive agreement between them. *See* Plaintiff's Supplemental Brief at 13. Unlike this case, the contract in *Computerized Radiological* did not contain a merger clause. *See Computerized Radiological,* 595 F.Supp. at 1505.

tween the parties and that any modification must be in writing, as follows:

> [t]his Agreement constitutes the entire agreement of the parties with respect to its subject matter, and no prior or contemporaneous understanding or representation, whether written or oral, shall be binding except to the extent expressly set forth herein. This agreement may be amended only in writing signed by both parties.

SCA, ¶ 12.

■ To avoid the merger clauses in the SCA, Plaintiff focuses upon the phrase in paragraphs eleven and twelve of the SCA that limits the merger clauses to "this subject matter." Plaintiff argues that the "this subject matter" of the SCA is volume discounts, and not the separate obligations that MCI undertook by virtue of the carrier-reseller relationship the parties entered into, and thus, the services that MCI failed to provide were not part of the subject matter of the SCA. The Court disagrees.

Plaintiff's interpretation of the scope of the subject matter encompassed by SCA, as limited to only volume discounts, is an overly restrictive reading of the SCA. All of the services that Plaintiff alleges that MCI failed to provide relate to the arrangement between Plaintiff and Defendant whereby Defendant MCI would sell telephone time to Plaintiff for resale to Plaintiff's customers. The Court finds that the services that MCI allegedly promised to render to Plaintiff are within the scope of the subject matter as contemplated by the parties in the SCA, and thus, Plaintiff is bound by the merger clauses within the SCA.[13] If Plaintiff required special considerations that were necessary for Plaintiff's compliance with the SCA, then the parties should have specifically provided for them in the SCA.

Plaintiff's second theory is that these services are part of an oral modification of the SCA. The SCA, however, contains a clause that prohibits modifications, as follows:

"[t]his Agreement may be amended only in writing signed by both parties." SCA, at ¶ 12. The Court finds that there is no evidence of a written agreement to modify signed by both parties, as required by the SCA.

■ Plaintiff's third theory is that, in addition to Defendant's failure to provide telecommunications services to Plaintiff, Defendant failed to provide other services that involve the confirmation of the orders that Plaintiff placed with Defendant pursuant to the SCA. Plaintiff relies upon the language in the SCA regarding Defendant's agreement to provide "interstate service(s), intrastate service(s), and international service(s) pursuant to this Agreement and MCI's tariffs governing such services," as the source of Defendant's contractual obligation. Plaintiff's quotation to the SCA, however, is not complete.

The SCA states that Defendant MCI will provide service to Plaintiff Intex/Delaware pursuant to the MCI Tariff, except where one of the paragraphs enumerated in the SCA supplements or contradicts the Tariff, in which case the SCA controls, as follows:

> MCI will provide to Customer, and Customer will receive from MCI, interstate service(s), intrastate service(s), and international services pursuant to this Agreement and MCI's tariffs governing such services. This agreement incorporates by reference the terms of MCI Tariff No. 1 ("Tariff") on file with the Federal Communications Commission, which Tariff may be modified from time to time by MCI in accordance with law and thereby affect the service(s) furnished Customer, except that the following terms and conditions shall supplement or, to the extent inconsistent, supersede Tariff terms and conditions and shall remain in effect throughout the service term.

November 16, 1990 SCA. The SCA specifically incorporates the MCI Tariff and pro-

---

13. To the extent that Plaintiff seeks to argue that these services are post-SCA contractual agreements between the parties, the Court finds that Plaintiff has not presented any evidence to support such a theory. The most Plaintiff has produced to oppose Defendant's Motion for Summary Judgment is evidence demonstrating that MCI considered performing many of these services for Plaintiff or that MCI thought these services were necessary for the performance of the SCA. Plaintiff has not produced any evidence that presents a triable issue on whether MCI is obligated to perform these services as part of a valid contractual agreement made after the SCA was signed.

vides that these services are to be provided pursuant to the Tariff. Only where the "following terms and conditions" either supplement the Tariff or are inconsistent with the Tariff does the SCA control.

Plaintiff does not attempt to argue, nor does examination of the SCA reveal, that any of the paragraphs following the above paragraph in the SCA obligate Defendant to provide any of the services enumerated by Plaintiff. Plaintiff has not directed the Court to any provision of the MCI Tariff that obligates Defendant MCI to provide any of the services that Plaintiff has enumerated above. To have a contractual obligation, there must first be a source for that contractual obligation. Here, Plaintiff has not shown the source of Defendant's alleged contractual obligation to provide Plaintiff with any of the above services.

■ Plaintiff also offers parol evidence that when Defendant and Plaintiff entered into the SCA, Defendant knew that Plaintiff was a reseller of telecommunications services, and that in order for the SCA to operate as contemplated by each party, Defendant would have to provide certain confirmation services. Plaintiff argues that by failing to provide the various services listed as breaches two through six above, Defendant MCI failed to provide "service(s)" as contemplated by the SCA, and, thus, is in breach of the SCA.

■ Under New York law, parol evidence is not admissible where "a contract is clear on its face and is sufficient alone to divine the intent of the parties." *Namad v. Salomon, Inc.,* 74 N.Y.2d 751, 545 N.Y.S.2d 79, 80, 543 N.E.2d 722, 723 (1989). "[W]hen the obligations are not clearly stated—when they are ambiguous—the parol evidence rule does not prevent the introduction of extrinsic evidence to aid in the interpretation of the contract." *Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 27 (2d Cir.1988). Whether the provisions of a contract are ambiguous is a question of law. *Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 27 (2d Cir.1988); *Bruni v. County of Otsego,*

192 A.D.2d 939, 596 N.Y.S.2d 888, 941 (1993). "A word or phrase is ambiguous when it is capable of more than a single meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Garza,* 861 F.2d at 27 (citations omitted).

Here, the Court finds that the phrase "MCI will provide to Customer, and Customer will receive from MCI, interstate service(s), intrastate service(s), and international service(s) pursuant to this Agreement and MCI's tariffs governing such services," is not ambiguous. In addition, the SCA then incorporates by reference the entire Tariff which is in the record and describes the scope of said services in great detail and the applicable rates thereto. The SCA is not ambiguous, but specifically provides that the services are pursuant to Tariff, unless modified below. Thus, parol evidence is not admissible to vary or expand the terms of the SCA and the Tariff.

### 1. *The Filed Tariff Doctrine*

■ The Court's above conclusions under New York law are consistent with the result reached by applying the Filed Tariff Doctrine under federal law.[14] Defendant MCI is obligated to provide Plaintiff Intex/Delaware only with those services that are part of the MCI Tariff, or are among the "following terms" that are listed in the SCA. All other claims are barred by the Filed Tariff Doctrine.

■ Under the Communications Act of 1934, all telecommunications carriers are required to file with the FCC a schedule of their charges for various telecommunications services. 47 U.S.C. § 203(a). MCI Tariff FCC No. 1 (the "MCI Tariff" or the "Tariff") is a schedule of charges for certain telecommunications services filed by Defendant MCI with the FCC. The filed tariff is a matter of public knowledge, 47 U.S.C. § 203(a), and the customer is presumed to know the filed rate.

---

**14.** Since the conclusions are the same, the Court is not required to find whether federal law would control. However, even if the results were not the same, the Court finds that the state choice of law does not bar applicability of federal law and the Filed Tariff Doctrine would bar recovery for non-SCA services.

*MCI Telecommunications Corp. v. The Best Telephone Co., Inc.*, No. 93–1581, slip op. at 14, —— F.Supp. ——, —— [1994 WL 842913] (S.D.Fla. April 26, 1994).

■ The Filed Tariff Doctrine is an accepted rule of law in this circuit. *See American Transport Lines, Inc. v. Wrves*, 985 F.2d 1065 (11th Cir.1993); *Taffet v. Southern Co.*, 967 F.2d 1483, 1487 (11th Cir.1992). The Filed Tariff Doctrine, as applied in this context, holds that where a telecommunications provider files a tariff with the FCC, then that provider cannot be liable for any representations contrary to the filed tariff. *See Id.* For example, since MCI has a filed tariff, MCI cannot be liable for telling a customer that it will receive a rate different than the filed rate.

■ The Filed Tariff Doctrine promotes adherence to the statutory scheme developed under the Communications Act of 1934. *MCI Telecommunications Corp. v. The Best Telephone Co., Inc.*, No. 93–1581, —— F.Supp. —— (S.D.Fla. April 26, 1994). The Supreme Court explains that "rate filing was Congress's chosen means of preventing unreasonableness and discrimination in charges.... The duty to file rates with the Commission, and the obligation to charge only those rates, have always been considered essential to preventing price discrimination and stabilizing rates." *MCI Telecommunications v. American Tel. & Tel.*, —— U.S. ——, ——, 114 S.Ct. 2223, 2231, 129 L.Ed.2d 182 (1994). Application of the Filed Tariff Doctrine promotes the Congressional statutory scheme for preventing price discrimination.[15]

■ This case is similar to the recent decision in *MCI Telecommunications Corp. v. The Best Telephone Co., Inc.*, No. 93–1581, —— F.Supp. —— (S.D.Fla. April 26, 1994). In *Best Telephone*, the plaintiff, MCI, sued the defendant, Best Telephone, "to recover unpaid charges for telecommunications services provided by MCI under the terms and conditions of MCI Tariff FCC No. 1...." *Best Telephone*, slip op. at 1, at ——. Best Telephone asserted the affirmative defenses of unclean hands, accord and satisfaction, waiver and estoppel and breach of the Tariff. The court in *Best Telephone* granted summary judgment to MCI and found that the Filed Tariff Doctrine barred the defendant's affirmative defenses, as well as the defendant's attempt to assert a counterclaim. *Best Telephone*, slip op. at 14–17, at ——. In reaching its conclusion, the *Best Telephone* court stated that "[i]t is well established in this Circuit that the Filed Tariff Doctrine precludes defenses available to a defendant in a standard contract dispute." *Best Telephone*, slip op. at 10–11, at ——. This Court agrees.

Here, Plaintiff Intex/Delaware owes Defendant MCI for telecommunication services that Defendant provided to Plaintiff. Plaintiff Intex/Delaware sued Defendant MCI first for Defendant's alleged failure to provide certain services. Defendant MCI counterclaimed for charges allegedly due under the MCI Tariff. In *Best Telephone*, the plaintiff argued that it should not have to pay the tariff rates to MCI because MCI failed to do certain things. Likewise, the basis for

**15.** The Filed Tariff Doctrine has its origins in the legal relationship between shipper and carrier. *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 126, 110 S.Ct. 2759, 2766, 111 L.Ed.2d 94 (1990). As described by the Court "[p]ast experience shows that billing clerks and other agents of carriers might easily become experts in the making of errors and mistakes in the quotation of rates to favored shippers, while other shippers, less fortunate in their relations with carriers and whose traffic is less important, would be compelled to pay the higher published rates." *Maislin*, 497 U.S. at 128, 110 S.Ct. at 2767.

The following passage from *Louisville & Nashville R. Co. v. Maxwell*, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915), is described as the "classic statement of the Filed Rate Doctrine:"

Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for applying charging either less or more than the rate filed. This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination.

*Maislin Industries, U.S. v. Primary Steel, Inc.*, 497 U.S. 116, 127, 110 S.Ct. 2759, 2766, 111 L.Ed.2d 94 (1990) (quoting *Louisville & Nashville R. Co. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915)).

Plaintiff's claim is that Defendant did not perform certain contractual services, and, thus, Defendant owes Plaintiff money damages that meet and surpass the amount that Plaintiff owes Defendant for the telecommunications services provided by Defendant under the MCI Tariff. Plaintiff's affirmative claims here are similar to the Defendant's affirmative defenses in *Best Telephone.* Both the defendant in *Best Telephone* and Plaintiff Intex/Delaware claim that they should not have to pay for telecommunications services provided by MCI because MCI failed to provide something. In this action, that "something" is services that are not a part of either the MCI Tariff or the SCA. Absent an obligation in MCI's Tariff, or in this case the SCA, any claims that Defendant MCI failed to provide services are barred by the Filed Tariff Doctrine. Here, Plaintiff's claims for additional services, not provided for in the SCA or the Tariff, are barred by the Filed Tariff Doctrine.[16]

■ In short, under the Filed Tariff Doctrine, it is the Tariff, not the representations of the carrier's employees that control. *Maislin Indus., U.S. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). Representations made or duties assumed outside the Tariff are not enforceable as a matter of federal law. *See, e.g., MCI Telecommunications Corp. v. Best Telephone Co., Inc.,* No. 93–1581, —— F.Supp. —— (S.D.Fla. April 26, 1994); *Marco Supply Co. v. AT & T Communications, Inc.,* 875 F.2d 434, 435–36 (4th Cir.1989). The Eleventh Circuit has held that the doctrine requires that the tariffed rates "must be charged and paid regardless of mistake, inadvertence or contrary intention of the parties." *American Transp. Lines, Inc. v. Wrves,* 985 F.2d 1065, 1067 (11th Cir.1993) (quoting *Gilbert Imported Hardwoods, Inc. v. 245 Packages of Guatambu Squares, More or Less,* 508 F.2d 1116, 1121 (5th Cir.1975)) Under the Filed Tariff Doctrine, even claims for fraud or intentional misquotation of rates have been rejected. *See, e.g., Consolidated Freightways Corp. v.*

*Terry Tuck, Inc.,* 612 F.2d 465, 466 (9th Cir.) *cert. denied,* 447 U.S. 907, 100 S.Ct. 2990, 64 L.Ed.2d 856 (1980).

Plaintiff contends that the Filed Tariff Doctrine applies to only a carrier's oral promises and misrepresentations about rates and not about oral promises about additional services to be provided by the carrier. This narrow interpretation of the Filed Tariff Doctrine is illogical, especially under the facts of this case. Plaintiff does not allege that it agreed to pay additional fees or increased rates for the so called additional services Plaintiff contends MCI orally agreed to provide. Thus, what Plaintiff, in effect, is seeking is more services than provided for in the tariff, or the SCA, but at the tariff rate. Such a result would circumvent the purpose of the tariff to set a published fixed rate for published fixed services. Under Plaintiff's theory, Plaintiff could avoid the Filed Tariff Doctrine, not by receiving a reduced rate, but by receiving more services for the same fixed rate.

■ Additionally, to the extent that Plaintiff claims that these services allegedly to be provided by Defendant MCI are in addition to the SCA, Plaintiff's allegations fail for lack of consideration. The record is devoid of any showing that any of the services claimed by Plaintiff are supported by consideration. The only obligation undertaken by Plaintiff is to pay Defendant for services pursuant to the tariff rates. Even without the Filed Tariff Doctrine, there is no showing of any additional consideration to support any non–SCA agreement between Defendant MCI and Plaintiff Intex/Delaware.

The Court GRANTS Defendant MCI partial summary judgment on Plaintiff's breach of contract claims itemized in numbers two through six above. In effect, Plaintiff may pursue breach of contract claims for MCI's contractual obligations under the SCA and the MCI Tariff, but not for breach of any alleged oral promises outside the SCA and the MCI Tariff.

---

**16.** Plaintiff directs the Court to *Towne Reader Service, Inc. v. MCI Telecommunications Corp.,* No. 91–cv–115S, 1992 WL 225550 (W.D.N.Y. Aug. 11, 1992). In *Towne Reader,* the Court held that the savings clause of the Communications Act of 1934 permitted a claim for common law fraud. This Court does not follow the *Towne*

*Reader* decision. First, under the law of this circuit, the Filed Tariff Doctrine is applicable. Second, the Court in *Towne Reader* was considering a fraud claim. Here, Plaintiff has pleaded a breach of contract claim. In any event, the same result occurs even if this Court applies New York law, as opposed to the Filed Tariff Doctrine.

### 2. *Defendant's Alleged Unilateral Termination of the SCA*

■ Defendant MCI also seeks summary judgment on Plaintiff's claim that MCI improperly terminated the SCA. Defendant MCI suggests this allegation is contrary to Plaintiff's earlier pleadings, where Plaintiff stated that "INTEX and MCI reached an agreement to terminate the SCA in late January and early February 1992." Plaintiff's First Complaint, at ¶ 25, 26. Defendant contends that Plaintiff should be estopped from pleading a different position regarding the termination of the SCA than was pleaded in Plaintiff's original Complaint.

■ Judicial estoppel " 'is applied to the calculated assertion of divergent sworn positions. The doctrine is designed to prevent parties from making a mockery of justice by inconsistent pleadings.' " *McKinnon v. Blue Cross and Blue Shield of Alabama,* 935 F.2d 1187, 1192 (11th Cir.1991) (quoting *American Nat. Bank v. Federal Deposit Ins. Corp.,* 710 F.2d 1528, 1536 (11th Cir.1983)). The Court finds that judicial estoppel as a matter of law is not warranted by the facts in this case, especially since Defendant MCI's Answer originally denied Plaintiff's allegation of mutual termination. Plaintiff made an initial mistake in its notice pleading, and subsequently amended its Complaint. While not indicative of careful pleading, Plaintiff's misstep does not warrant application of judicial estoppel as a matter of law.

■ Defendant MCI also argues that it could terminate the SCA at any time for Plaintiff Intex/Delaware's failure to pay, and that as of June, 1992 Plaintiff failed to pay the balance due on Plaintiff's account. Plaintiff counters that in December, 1991 Defendant MCI informed Mr Dejoria, Intex/Delaware's principal shareholder, that the SCA would be terminated. As of December, 1991, Plaintiff also had two letters of credit, each in the amount of $500,000 securing Plaintiff's accounts receivable with Defendant MCI. After being informed that the SCA would be terminated, Plaintiff states that it requested time to move its customers from the MCI network to another telecommunications network. The Court finds that jury issues exist regarding whether Defendant MCI improperly or correctly terminated the SCA. Therefore, the Court finds that on the current record summary judgment is not proper.

### D. *Count Five: Plaintiff's Claims for Breach of Implied Covenant of Good Faith and Fair Dealing Against Defendant*

■ In Count Five of its Complaint, Plaintiff alleges that Defendant breached the implied covenant of good faith and fair dealing. Defendant moves for summary judgment on Count Five.

"[U]nder New York law, a duty of good faith and fair dealing is implicit in every contract, but breach of that duty is merely a breach of the underlying contract." *Fasolino Foods Co. v. Banca Nazionale del Lavoro,* 961 F.2d 1052, 1056 (2d Cir.1992); *Geler v. National Westminster Bank USA,* 770 F.Supp. 210, 215 (S.D.N.Y.1991). Defendants contend that since Plaintiff cannot show a breach in the underlying contract, Plaintiff cannot state a claim for breach of Defendant MCI's duty of good faith and fair dealing. The Court, however, found above that triable issues remain as to whether Defendant MCI failed to perform certain services provided for in the terms of the SCA, which incorporated the Tariff. If Defendant breached the SCA or the Tariff, then Plaintiff would have the underlying breach of contract necessary to support its breach of implied covenant of good faith and fair dealing claim. Since the Court finds that genuine issues of material fact exist on the underlying contractual breach, Defendant MCI has not carried its burden to show it is entitled to summary judgment on Plaintiff's breach of implied warranty.

Taking all evidence and factual inferences in the light most favorable to the non-moving party, the Court finds that, on the record to date, entry of summary judgment is not proper on Plaintiff's claim that Defendant MCI breached its duty of good faith and fair dealing.[17] Therefore, the Court **DENIES**

---

17. Plaintiff's Communication Act claims have been referred to the FCC. Plaintiff cannot inject those claims back into this action by reference to New York's contract law on the duty of good faith and fair dealing.

Defendant MCI's Motion for Summary Judgment.

## V. DEFENDANT MCI'S MOTION FOR SUMMARY JUDGMENT ON COUNT SIX OF PLAINTIFF INTEX/DELAWARE'S COMPLAINT [18]

■ In Count Six of its Complaint, Plaintiff Intex/Delaware alleges that Defendant MCI tortiously interfered with Plaintiff's contractual and business relations. Defendant moves for summary judgment on Count Six.

■ In Georgia, a plaintiff claiming tortious interference with contractual or business relations must show that the defendant (1) acted improperly and without privilege, (2) acted purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) caused the plaintiff to suffer some financial injury. *St. Mary's Hosp. v. Radiology Professional Corp.*, 205 Ga.App. 121, 124, 421 S.E.2d 731 (1992). Summary judgment is appropriate where the defendant demonstrates the lack of any one of the elements.

*See Id.* Here, Defendant contends that there is no evidence in the record that Defendant "induced a third party or parties not to enter into or to continue a business relationship" with Plaintiff.[19]

■ In response, Plaintiff offers the affidavit of Steven Talsness, an employee of Sun State Capital Management, Inc., one of Intex/Delaware's former customers. In his affidavit, Talsness states that Talsness received a phone call from an individual who identified himself as a MCI employee. Talsness states that the MCI employee told Talsness "that INTEX was about to go out of business," and that "if Sun State wished to maintain its 800 telephone number, it would be necessary for Sun State to switch its long-distance service over to a carrier other than INTEX." Talsness states that, based upon the representations from the phone-caller, he switched his service to MCI. Defendant MCI objects to the Talsness affidavit as inadmissible hearsay.

Plaintiff contends that the Court must consider inadmissible hearsay when offered by the non-movant to a motion for summary judgment.[20] To support its position, Plaintiff quotes the recent Eleventh Circuit opinion in

The Georgia Court of Appeals recently explained that the claimant in a tortious interference with contract action cannot base his claim for tortious interference upon the defendant's breach of a contract with the claimant, as follows:

> the claimant still must prove that the defendant directly induced adverse behavior by the third party with respect to the third party's contract with the claimant, not merely that the defendant breached its contract with the claimant and that an element of damage resulting from that breach was the impairment of the claimant's performance of its contract with the third party.

*Sandifer v. Long Investors, Inc.*, 211 Ga.App. 757, 760, 440 S.E.2d 479 (1994). The same requirement applies for tortious interference with business relations. *Renden, Inc. v. Liberty Real Estate Ltd. Partnership III*, 213 Ga.App. 333, 335, 444 S.E.2d 814 (1994) (an "essential element of tortious interference with business relations is that the alleged tortfeasor induced a third party or parties not to enter into or continue a business relationship with the plaintiff").

20. Defendant MCI replies that the fact that the Talsness affidavit contains inadmissible hearsay is not a new ground for summary judgment. Nonetheless, the Court will consider Plaintiff's Supplemental Brief where Plaintiff suggests that certain otherwise inadmissible materials are properly considered by the Court on a motion for summary judgment.

---

18. Both parties appear to agree that Georgia law, rather than New York law, is applicable to Plaintiff's claim of intentional interference.

19. One of the theories propounded by Plaintiff in support of its tortious interference claim is that by failing to provide services to Plaintiff under the SCA, Defendant MCI tortiously interfered with Plaintiff's business relations. Neither of the cases cited by Plaintiff support the theory that where one party breaches its contract the other party to the contract may bring a claim for tortious interference. In *Robles v. Humana Hosp. Cartersville*, 785 F.Supp. 989 (N.D.Ga. 1992), the Court found that the plaintiff did not have an underlying contract claim. Additionally, the *Robles* Court did not find that the plaintiff did not need to show that the defendant induced a third party not to enter into or to cease business relations with the plaintiff. Indeed, the court in *Robles* specifically listed the requirement that defendant induce a third party as one of the elements of the cause of action. *Robles*, 785 F.Supp. at 1003. Nor does Plaintiff's citation to *Piedmont Cotton Mills, Inc. v. H.W. Ivey Constr. Co.*, 109 Ga.App. 876, 137 S.E.2d 528 (1964) support Plaintiff's theory. As explained in a subsequent Georgia Court of Appeals case, *Piedmont* involved a direct interference by the defendant in the plaintiff's property interest. *First Mortgage Corp. v. Felker*, 158 Ga.App. 14, 16, 279 S.E.2d 451 (1981). A breach of a contract does not amount to such direct interference. *Id.*

*Church of Scientology v. City of Clearwater*, 2 F.3d 1514, 1531 (11th Cir.1993), where the Eleventh Circuit wrote "[e]ven if [the newspaper articles] would have been inadmissible at trial (and we do not hold that they would have been), such materials were appropriately submitted by the non-moving party in opposition to the motion for summary judgment." *Scientology*, 2 F.3d at 1530. From the Eleventh Circuit's comment on the appropriateness of considering newspaper articles, Plaintiff leaps to its position that hearsay evidence is sufficient to oppose successfully an otherwise proper motion for summary judgment. Plaintiff's position is not supported by the law of this circuit or any other circuit.

In *Scientology*, the Eleventh Circuit was addressing the form that evidence had to take when presented by the non-movant in opposition to a motion for summary judgment. The Eleventh Circuit was not stating that inadmissible hearsay was admissible to defeat summary judgment, thereby causing a trial that would result in a Rule 50 judgment of law ruling based upon the lack of admissible evidence. While only implicit in the *Scientology* opinion, other circuits have expressly explained the distinction. The Seventh Circuit recently explained that evidence presented by a non-movant need not be in an admissible form, but the substance of the evidence must be admissible, as follows:

> "The evidence need not be in admissible *form*; affidavits are ordinarily not admissible evidence at trial. But it must be admissible in *content*, for example a substitution of oral testimony for a summary of that testimony in an affidavit, would make the evidence admissible at trial. Occasional statements in cases that the party opposing summary judgment must present admissible evidence should be understood in this light, as referring to the content or substance, rather than the form, of the submission.

*Winskunas v. Birnbaum*, 23 F.3d 1264, 1267–68 (7th Cir.1994) (citations omitted); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir.1994) ("evidence set forth must be of a kind admissible at trial"). The D.C. Circuit likewise explains, that "[w]hile it is not necessary that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment, normally hearsay would not be enough to raise an issue of fact for summary judgment purposes." *Kimberlin v. Quinlan*, 6 F.3d 789, 797 (D.C.Cir.1993) (citations omitted).

Here, Talsness's statements are inadmissible hearsay. The statements, that Talsness would testify about at trial, concern what an alleged MCI employee said, and are out of court statements offered for the truth of the matter asserted, and, as such, are hearsay. Nor does Talsness's testimony become admissible as an admission of a party opponent under Federal Rule of Evidence 801. *See* Fed.R.Evid. 801(d)(2)(C), (D). Plaintiff fails to establish an evidentiary foundation from which the Court can determine whether the phone caller was an MCI employee, and, thus, Plaintiff cannot avail itself of Federal Rule of Evidence 801. *See* Fed.R.Evid. 801(d)(2)(C), (D); *United States v. Christopher*, 923 F.2d 1545, 1551 (11th Cir.1991). As inadmissible hearsay, the Court will not consider the Talsness affidavit. Fed.R.Civ.P. 56(e); *American Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1579–80 (11th Cir. 1985); *Joiner v. General Elec. Co.*, 864 F.Supp. 1310, 1317 (N.D.Ga.1994); *Reliance Ins. Co. v. Romine*, 707 F.Supp. 550, 551 (S.D.Ga.), *aff'd*, 888 F.2d 1344 (11th Cir. 1989).

The Court finds that Plaintiff has failed to introduce any admissible evidence, regardless of the form of the evidence, to raise a genuine issue as to whether Defendant induced any third party to cease its business or contractual relations with Plaintiff. Defendant has demonstrated that Plaintiff will not be able to meet its burden of proof on one of the elements of its tortious interference claim. Therefore, the Court **GRANTS** Defendant MCI's Motion for Summary Judgment on Count Six of Plaintiff's Second Amended Complaint.

VI. *DEFENDANT MCI'S MOTION FOR SUMMARY JUDGMENT ON COUNT THREE OF PLAINTIFF INTEX/DELAWARE'S COMPLAINT*

In Count Three of its Second Amended Complaint, Plaintiff alleges a violation of 47 U.S.C. § 203(c). The parties agree that the basis for this claim arises from

Defendant MCI's miscalculation of Plaintiff's discount under an agreement known as Network Savings Plan Option 5. The parties also agree that Defendant MCI refunded promptly $105,964.90, the balance of the miscalculated discount, once the error was brought to the attention of Defendant MCI.

Plaintiff bases its claim upon Defendant MCI's failure to pay any interest that accrued during the time the $105,964.90 was withheld. Damages are not presumed under the private right of action provided for in Section 206. *See RCA Global Communications, Inc. v. Western Union Tel. Co.*, 521 F.Supp. 998, 1006 (S.D.N.Y.1981); *In re Communications Satellite Corp.*, 97 F.C.C.2d 82 (1984). Here, Defendant MCI alleges that Plaintiff has not suffered any damages from the withheld money that has since been refunded. In support of its contention, Defendant MCI directs the court to the deposition testimony of John Parge, President of Intex, who testified "there was never any involvement with interest and stuff." Indeed, none of Plaintiff's witnesses has testified that Plaintiff sustained any damage from the withheld money. Defendant also demonstrates that Plaintiff has not produced any documents that support Plaintiff's allegations that it sustained actual or consequential damages by virtue of the billing error.

In response to Defendant's position, Plaintiff argues that it is entitled to interest for three reasons. First, Plaintiff alleges that Defendant admitted that Defendant owed Plaintiff interest. This is not accurate. Defendant suggested in a scheduling order that Defendant would pay a 6% rate on the $105,-964.90. Plaintiff rejected Defendant's position by stating that a 6% rate was only acceptable if the parties would apply 6% to all of the prayers for monetary relief in the case. In a May 9, 1994 Order, Judge Hall stated that "[i]f the parties wish to submit to the Court a proposed settlement agreement which resolves the issue of what interest rate to apply to which claims, the Court will consider the parties' proposed figures." Judge Hall's May 9, 1994 Order [142–1]. The parties have not submitted any settlement papers to the Court regarding Count Three of Plaintiff's Complaint.

Plaintiff's second contention is that New York law permits the recovery of interest on money wrongfully withheld. *See Parkway Windows, Inc. v. River Tower Assocs.*, 108 A.D.2d 660, 485 N.Y.S.2d 755 (1985). The SCA requires that Plaintiff "maintain in effect an MCI Network Savings Plan–Option 5 Agreement." SCA, at ¶ 2(c)(iii). The SCA does not, however, impose its choice of law provision upon the Network Savings Plan–Option 5 agreement (the "NSP"). The NSP is controlled by MCI's "[t]ariff terms and conditions." MCI Network Savings Plan–Option 5 Agreement. Simply put, the SCA does not impose New York law upon the NSP, and the NSP is controlled by MCI Tariff FCC No. 1, as construed under federal law.

Plaintiff's third and last contention is that, as a matter of equity, Defendant should pay interest upon the withheld amount because Defendant MCI also seeks interest. Plaintiff does not direct the Court to where Defendant MCI seeks interest. Nor does Plaintiff cite the Court to any authority for its proposition. In its reply, Defendant MCI shows the Court that it is not seeking pre-judgment interest, but rather seeks attorney fees and costs pursuant to MCI's Tariff. After review of the record, the Court finds that Defendant MCI has shown affirmatively that Plaintiff has no basis in law or in fact, on the facts presented in this record, to recover interest for the refunded $105,964.90. Additionally, Plaintiff has failed to respond with any evidence or legal citation demonstrating that Plaintiff is entitled to the interest. Therefore, the Court **GRANTS** Defendant's Motion for Summary Judgment on Count Three of Plaintiff's Second Amended Complaint.[21]

21. Defendant moves for the award of attorneys' fees and costs for the expenses incurred in collecting the balance that Plaintiff owes to Defendant, pursuant to a provision of the MCI Tariff that reads as follows:

In the event [MCI] incurs fees or expenses, including attorney's fees, in collecting, or attempting to collect, any charges owed [MCI]

the customer will be liable to [MCI] for the payment of all such fees and expenses reasonably incurred.

MCI Tariff § B–7.09.

As discussed above, Defendant is entitled to summary judgment on some of the accounts discussed in Count Two of Defendant's Counterclaim, and thus, would be entitled to "expenses

## VII. *DEFENDANT MCI'S MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS BASED UPON PLAINTIFF INTEX/DELAWARE'S LACK OF DAMAGES*

Defendant MCI moves for summary judgment on all counts of Plaintiff's Complaint contending that Plaintiff cannot demonstrate any damages. Since the Court has already granted summary judgment in favor of Defendant MCI on Counts Three and Six of Plaintiff's Complaint, the Court will address only Plaintiff's contract claims in Counts Four and Five of Plaintiff's Complaint.

■■■ Defendant MCI contends that Plaintiff Intex/Delaware is unable to prove damages from any alleged breach of the SCA, and thus cannot meet the burden of one of the elements for its breach of contract claim. Defendant's contention follows two veins of argument. First, Defendant contends that Plaintiff should be barred from introducing the evidence that Plaintiff has submitted as a sanction for bad faith discovery practices. Second, Defendant argues that Plaintiff cannot demonstrate its damages because it is a new business.

Defendant recites a litany of practices that Defendant contends demonstrates Plaintiff's bad faith in providing Defendant with evidence to support Plaintiff's allegations on damages. Plaintiff responds by detailing Plaintiff's understanding of events. The Court has examined the record and both parties' contentions regarding Plaintiff's late disclosure of evidence on damages. The Court finds that the severe sanctions requested against Plaintiff are not warranted, and the Court will consider Plaintiff's evidence of damages. The Court will reach the merits of the question of whether there is any evidence that Plaintiff suffered damages as a result of Defendant's alleged breach of the SCA.

■■■ Defendant focuses the majority of its argument on whether Plaintiff can recover for the loss of future profits. To recover damages for lost profits under New York law, Plaintiff must show (1) that its damages were caused by Defendant MCI's breach, (2) that the alleged loss is capable of proof with reasonable certainty, and (3) that the particular damages were within the contemplation of the parties to the contract at the time it was made. *Ashland Management Inc. v. Janien,* 82 N.Y.2d 395, 604 N.Y.S.2d 912, 916, 624 N.E.2d 1007, 1011 (1993). In determining the loss of future profits for a new business, a stricter standard is imposed. *Id.* However, "[t]he fact that a business has not been long established does not mean that its projected profits are unduly speculative, so long as there is a rational basis on which to calculate the lost profits." *F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1260 (2d Cir.1987). Regardless of whether a new business or an old business is seeking recovery for the loss of future profits, "the test remains the same, i.e. whether future profits can be calculated with reasonable certainty." *Ashland Management,* 604 N.Y.S.2d at 916, 624 N.E.2d at 1011.

■■■ When moving for summary judgment on an element of the case on which the non-moving party bears the burden of proof at trial, the Eleventh Circuit explains that the movant may discharge its initial burden by pointing to the absence of evidence, as follows:

> [f]or issues [ ] on which the non-movant would bear the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim in order to discharge this initial responsibility. Instead, the moving party simply may show-that is point out to the district court-that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.

*Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993). Here, Defendant MCI

reasonably incurred." However, triable issues exist on some of the other accounts. Therefore, the Court declines to award Defendant its expenses reasonably incurred in collecting the charges Plaintiff owes, at this time. The Court

will address whether and to what extent Defendant is entitled to the award of attorneys' fees and costs once all of Count Two of Defendant's Counterclaim is resolved.

has met its initial burden to point out an absence of evidence on damages, a necessary element of Plaintiff's case. Plaintiff now has the burden to present evidence that raises a factual dispute, as follows:

> [f]or issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending upon whether the movant put on evidence affirmatively negating the material fact or instead demonstrated an absence of evidence on the issue.... Where the movant did the latter, the non-movant must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.

*Id.* at 1116 (citations omitted). Here, Plaintiff introduces additional evidence in the record that demonstrates Plaintiff's damages. Specifically, Plaintiff offers the affidavit of David Kennedy, as an expert who has analyzed and now states the damages of Intex/Delaware.

Defendant MCI challenges the admissibility of Kennedy's affidavit. At this stage of the litigation, however, Defendant MCI has offered arguments to impeach Kennedy's analysis, but has not demonstrated why Kennedy's affidavit has no value in determining Plaintiff's damages. Defendant MCI concedes that there is at least some evidence that Plaintiff may present, but appears to debate the admissibility of some of Plaintiff's evidence. *See* Defendant MCI's Reply Brief [161–1], at 39 n. 26 ("[a]ssuming that INTEX/Delaware's claims otherwise survive MCI's motion for summary judgment on the issue of liability, INTEX, of course, would not be prevented from proving damages previously identified during the course of discovery"). Plaintiff's evidence is sufficient to withstand Defendant's Motion for Summary Judgment based upon a failure to produce any evidence on damages.[22]

## VIII. *DEFENDANT MCI's MOTION FOR SUMMARY JUDGMENT ON COUNTS TWO AND THREE OF ITS COUNTERCLAIM FOR PAYMENTS DUE UNDER THE MCI TARIFF*

■ Defendant MCI seeks summary judgment on Counts Two and Three of its Counterclaim, in which Defendant demands payment for telecommunications services that Defendant rendered to Plaintiff pursuant to the terms and conditions of the MCI Tariff, as incorporated in the SCA. Under MCI's Tariff, the customer is responsible for all charges incurred in connection with service provided by MCI, as follows:

> [t]he customer is responsible for payment of all charges for services furnished to the customer or its joint or authorized users. This responsibility is not changed by virtue of any use, misuse, or abuse of the customer's service or customer-provided systems, equipment, facilities, or services interconnected to the customer's service, which use, misuse, or abuse may be occasioned by third parties, including, without limitation, the customer's employees or other members of the public.

MCI Tariff FCC No. 1, § B–7.01. Further, "MCI's bills are payable upon receipt." *Id.* at § B–7.03. As discussed above, the Filed Rate Doctrine prohibits carriers from charging any fees but those that are listed in the carriers' filed tariffs. A "tariff, required by law to be filed, constitutes the law and not merely a contract." *American Tel. & Tel. Co. v. Florida–Texas Freight, Inc.,* 357 F.Supp. 977, 979 (S.D.Fla.), *aff'd,* 485 F.2d 1390 (5th Cir.1973).

The charges that Plaintiff allegedly owes to Defendant are categorized in fifteen separate accounts. The Court will examine each account in turn.

---

**22.** Even if the Court were to ignore the Kennedy affidavit, the Court finds that there is evidence in the record that Plaintiff Intex/Delaware suffered the loss of future profits from Defendant MCI's alleged breach of the SCA. There are significant questions as to the extent of those future profits, and even admissibility questions as to how they may be proved. On the current record, however, the Court finds that Defendant MCI has not carried its burden to show Plaintiff cannot recover for loss of profits as a matter of law.

### A. *800 Account 99071313*

■ Defendant MCI seeks payment for Plaintiff's use of 800 service in the amount of $238,126.51. Plaintiff does not dispute that it used Defendant MCI's 800 service. Nor does Plaintiff dispute that this is the amount Plaintiff owes Defendant MCI under the rates in the Tariff. Instead, Plaintiff's defense is that it was charged a rate different from other MCI customers for these 800 services in violation of the Communications Act of 1934. Plaintiff has not cited the Court to any authority for the proposition that an alleged violation of the Communications Act of 1934 is a defense to charges properly billed under the filed tariff.[23] Therefore, the Court finds that summary judgment is proper, and that Plaintiff owes Defendant MCI $238,126.51 for services performed in connection with 800 Account 99071313.

### B. *800 Account 99038349*

Both parties state that there are triable issues of material fact regarding this account. Therefore, summary judgment is not proper.

### C. *Prism Accounts*

■ The prism accounts, also referred to as "Q" accounts, are numbered Q0352209, Q0350946, Q0352298, and Q0352216. As an initial matter, the Court finds that federal law and the applicable MCI Tariff govern collection of any services provided under MCI's Tariff. The Court also finds that any credit allegedly contemplated by MCI and allegedly suggested to Intex/Delaware is barred by the Filed Tariff Doctrine.

Entry of summary judgment, however, is not proper on the record currently presented. Disputed facts appear to exist on issues regarding the receipt of bills as governed under MCI's Tariff. The materiality of these factual issues remains an open question to some extent. The Court finds that the following legal issues will require resolution at trial: (1) the legal effect of delayed receipt of bills under the filed tariff, and (2) whether receipt of bills through discovery is proper

receipt as contemplated by MCI's Tariff. Clarification of these legal issues at trial will aid the Court in determining the materiality of existing factual disputes.

Therefore, each party should file a trial brief on these issues at the start of trial. No brief shall exceed twenty (20) pages.

### D. *Private Line Service Account 000258577*

Plaintiff concedes liability for the balance of this account in the amount of $105.00. Therefore, the Court finds that summary judgment for Defendant MCI on its Counterclaim is proper for account 000258577 in the amount of $105.00.

### E. *T–1 Accounts Nos. 00314452, 00320450, and 00340211*

Plaintiff concedes liability upon these accounts. Therefore, the Court finds that summary judgment for Defendant MCI on its Counterclaim is proper for the balance of T–1 accounts numbered 00314452, 00320450, and 00340211 in the amount of $33,276.11.[24]

### F. *T–1 Account Nos. 00310956 and 00320547*

■ Plaintiff argues in opposition to Defendant MCI's Motion for Summary Judgment on these two accounts that Plaintiff could not bill its own customers and that Plaintiff is owed a credit for these two accounts. Plaintiff does not contend that MCI failed to bill for these accounts. The Court finds that Plaintiff's argument concerning its ability to bill its own customers is not a viable defense to otherwise properly received charges. Also, the Filed Tariff Doctrine bars Plaintiff's reliance upon any credit for these accounts. Therefore, the Court finds that entry of summary judgment for Defendant MCI on its Counterclaim is proper for the balance of T–1 accounts numbered 00310956 and 00320547 in the amount of $16,686.15.

### G. *T–1 Account Nos. 00601498 and 00012744*

■ Phillip Cox, Treasurer and Chief Financial Officer of Intex/Delaware, states in

---

**23.** Plaintiff's claims of discriminatory pricing, in Counts One and Two, have been referred to the FCC for adjudication.

**24.** The Court determined the amount on the three T–1 accounts on which Plaintiff concedes liability from the account summaries attached to the affidavit of Ralph McCumber. This amount differs from the amount argued in Defendant MCI's reply brief on page 65.

his affidavit that Intex/Delaware has never received some of the invoices for these accounts. Defendant MCI directs the Court to a summary of account for T–1 Account 00012744. This is a summary sent by Defendant MCI to Plaintiff. There is no showing that such a summary is an acceptable substitute for receipt of a bill from MCI, as required under the MCI Tariff. Therefore, the Court finds that there are genuine issues of material fact as to whether Plaintiff ever received these invoices.[25] The Court finds that summary judgment for Defendant MCI on its Counterclaim on these accounts is not proper on the record as currently presented.

### H. *VNET Account No. 99063688*

■ Defendant MCI claims that Plaintiff Intex/Delaware owes the balance of VNET account 99063688, which totals $455,057.36. Plaintiff objects to this figure, claiming that Defendant previously billed Plaintiff at a lower rate for these services. Plaintiff claims that by agreement between the parties, Plaintiff was to be billed at the lower rate. Defendant MCI seeks to recover the tariff rate for these services. Under the Filed Tariff Doctrine, the tariff rates are what Defendant MCI must charge. Defendant MCI may charge Plaintiff the tariff rate. Plaintiff does not dispute that Defendant's balance is the proper rate under the MCI Tariff. Therefore, the Court finds that Defendant MCI may recover the balance for the VNET account numbered 99063688, billed at the tariff rate.

■ Plaintiff also argues that Defendant MCI originally billed Plaintiff at the discount rate for NSP Option 1 and not the correct rate under the NSP 5 Option agreement. It is undisputed that Defendant MCI credited Plaintiff the difference by off-setting the amount Plaintiff owed Defendant MCI for "charge-back" fees. Plaintiff argues that this credit was lost after Defendant MCI agreed to reverse the total charge-back fees, but failed to separate the original NSP credit before reversing the charge-back fee account.

To support its argument, Plaintiff cites the Court to an Accounts Receivable Journal Voucher Adjustment. Plaintiff relies upon Cox's affidavit, where Cox explains the loss of $105,964.90 when "pursuant to an agreement between INTEX and MCI to credit the SCA discount charge-back," MCI did not credit the full amount of charge-back, but instead only credited the balance. Nowhere does Plaintiff direct the Court to any details of an agreement whereby MCI would credit Plaintiff the total charge-back fees, as opposed to just the balance remaining after the NSP credit was deducted. Indeed, the entries on the Accounts Receivable Journal Voucher Adjustment border on the indecipherable, and do not support Plaintiff's contention. However, taking all facts and inferences therefrom in the light most favorable to the non-moving party, the Court finds that a genuine issue of material fact exists on whether the balance for the VNET account is accurate. Therefore, summary judgment for Defendant MCI on its Counterclaim on the VNET account is not proper.[26]

### IX. *PLAINTIFF INTEX/DELAWARE'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS ONE, TWO AND FOUR OF DEFENDANT MCI'S COUNTERCLAIM*

Plaintiff Intex/Delaware moves for summary judgment on Defendant MCI's fraud claims in Counts One and Four[27], as well as the underutilization charges contained in

---

**25.** The Court recognizes that Plaintiff does not allege that it did not receive the invoices for April and May of 1992. The Court finds, however, that it is appropriate to address the balance of these two accounts in one complete ruling, rather than piece-meal the recovery invoice by invoice. Therefore, the Court does not enter summary judgment where triable issues remain as to accounts numbered 00601498 and 00012744.

**26.** The Court recognizes Defendant MCI's request for entry of final judgment pursuant to Federal Rule of Civil Procedure 54. Fed.R.Civ.P.

**54.** The Court, in its discretion, declines to enter final judgment on any of the claims at this juncture. The Court finds that final judgment is best entered after resolution of all of the claims in this case.

**27.** Although Plaintiff's Motion for Summary Judgment says that Plaintiff is moving for summary judgment on Count Three of Defendant MCI's Counterclaim, it is apparent from reading Plaintiff's briefs that Plaintiff is moving for summary judgment on Count Four.

Count Two of Defendant MCI's Counterclaim.

### A. *Count One: Defendant MCI's Counterclaim for Fraud*

■ In Count One of its Counterclaim, Defendant MCI alleges that Intex/Delaware committed fraud upon Defendant MCI by holding itself out as a party to the SCA, and by securing telecommunications services from Defendant MCI on that basis.

■ As the Court found above, triable issues exist regarding whether the SCA was assigned or otherwise transferred from Intex/California to Intex/Delaware. Therefore, the Court will assume, for purposes of evaluating Defendant MCI's fraud count in the context of Plaintiff's Motion for Summary Judgment, that the SCA was not transferred to Intex/Delaware.

In Georgia, the tort of fraud is composed of the following five elements:

(1) misrepresentation by a defendant of a material existing fact,

(2) with knowledge that it is false or made with a reckless disregard as to whether it is true,

(3) with intent to induce the plaintiff to act or refrain from acting,

(4) that is justifiably relied upon by the plaintiff,

(5) that because of such reliance, the plaintiff is damaged.

*Hubbard v. Stewart*, 651 F.Supp. 294, 297 (M.D.Ga.1987). Under Georgia law, "questions of fraud, bad faith, and materiality of misrepresentation are normally for the jury." *Williams v. Dresser Indus., Inc.*, 795 F.Supp. 1144, 1148 (N.D.Ga.1992). Only "where the evidence as a whole excludes every reasonable inference but one" may the Court rule upon fraud as a matter of law.

Here, the Court finds that there are genuine issues of material fact regarding Defendant MCI's fraud claims. First, the Court finds that there is a dispute over whether

Defendant MCI was misled when its representatives inquired into the current corporate structure of Intex, and allegedly were informed that the Intex performing the SCA was the same Intex that MCI had been involved with since the signing of the SCA.[28]

The Court finds that there are triable issues regarding whether representatives of Plaintiff Intex/Delaware knowingly made false statements or made statements with reckless disregard for the truth of these statements. Triable issues also exist as to whether these alleged statements were made with the intent of inducing MCI to act or refrain from acting. Plaintiff argues that there is nothing that Defendant MCI could have done had MCI known that Intex/Delaware was performing the SCA, and not Intex/California. The Court disagrees. Under Section B–7.04 of the MCI Tariff, made a part of the SCA by incorporation, MCI was able to seek further financial assurances for "[a]pplicants for service or existing customers whose financial condition is not acceptable to MCI,...." MCI Tariff FCC No. 1, § B–7.04. Therefore, any misrepresentation is not as irrelevant to MCI's ability to protect itself as Plaintiff suggests.

■ Genuine issues of material fact also exist on whether MCI reasonably relied upon any representations made by Plaintiff. Plaintiff contends that at the very least, Defendant MCI was on inquiry-notice since MCI had documents in its possession that explained Intex/Delaware's role with regards to the SCA. Defendant MCI offers the deposition testimony of McCumber and his efforts in engaging in due diligence with regard to Intex/California, and with regard to Mr. DeJoria and Plaintiff's one million dollar letter of credit. *Pinkerton & Laws Co., Inc. v. Roadway Express, Inc.*, 650 F.Supp. 1138, 1147 (N.D.Ga.1986) (reasonable diligence usually jury question). Based upon the above, the Court **DENIES** Plaintiff's Motion for Summary Judgment on Count One of Defendant's Counterclaim.[29]

---

**28.** Plaintiff focuses upon the fact that Mr. McCumber said, during his deposition, that he couldn't "swear on a stack of bibles." Mr. McCumber's reaction, however, addressed whether Wilcox said that MCI was "still dealing with a California corporation," not whether Wilcox represented that there were no substantive changes in the party performing the SCA. On

this latter point, McCumber stated that Wilcox said that there "were no substantive changes, [or] words to that effect."

**29.** Plaintiff argues that Defendant's damages for Plaintiff's alleged fraud and Defendant's damages for Plaintiff's alleged failure to pay charges due under the Tariff are the same. Based upon

**B. *Count Two: Defendant MCI's Counterclaim for Underutilization Charges***

▓▓▓ Plaintiff moves for summary judgment on the underutilization charges that are in Count Two of Defendant's Counterclaim. In support of its Motion, Plaintiff argues that the underutilization charges that Defendant MCI seeks to recover were released by MCI in exchange for an advance payment made by DeJoria, on behalf of Plaintiff Intex/Delaware.[30] In opposition, Defendant MCI contends that it released the underutilization charges as part of an overall agreement between the parties to clear up all disputes between the parties. Defendant MCI argues that included in the package deal was an agreement that Plaintiff's contractual claims would also be resolved. Defendant MCI states that after Plaintiff sued MCI on the contractual claims, Defendant MCI treated Plaintiff's suit as a repudiation of the agreement and, thus, counterclaimed for the previously reversed underutilization charges. The Court finds that genuine issues of material fact exist regarding whether Defendant MCI and Plaintiff Intex/Delaware entered into an agreement whereby the underutilization charges would be reversed in exchange for Plaintiff's release of its contractual claims and other disputes.[31]

**C. *Count Four: Defendant's Counterclaim for Fraud***

▓▓▓ In Count Four of its Counterclaim, Defendant states a fraud claim based upon certain representations allegedly made by DeJoria to MCI. Specifically, Defendant MCI alleges that DeJoria agreed to provide

additional security in exchange for MCI's commitment to continue service despite the expiration of the letters of credit. Defendant MCI alleges that DeJoria had put up a one million dollar letter of credit to fulfill the security requirement of paragraph 5 of the SCA. According to Defendant MCI, DeJoria lied to MCI when, in an attempt to induce MCI not to draw upon the letter of credit, DeJoria stated that Intex/Delaware would be able to meet its obligations and that DeJoria would "be personally responsible for INTEX's indebtedness."

DeJoria is not a party to this action. Indeed, Judge Hall refused to permit DeJoria's joinder to this action. *See* Judge Hall's March 11, 1993 Order. Defendant MCI suggests that a factual issue exists over whether DeJoria was performing in a representative capacity when he allegedly made these statements to MCI. Defendant MCI argues that Plaintiff's suggestion is contradicted by Plaintiff's argument regarding the alleged negotiation and release of the underutilization charges that were negotiated by "John Paul DeJoria, on behalf of INTEX." *See* Plaintiff's Brief in Support of its Motion for Summary Judgment, at 61–62.

▓▓▓ "Under Georgia law, a corporation and its shareholders and officers are separate, even if one person owns all of its shares and controls its actions." *United States v. Fidelity Capital Corp.*, 920 F.2d 827, 837 (11th Cir.1991). As explained by the Georgia Court of Appeals, a shareholder and his corporation are two separate legal entities, even where the shareholder owns all of the corporation's stock, as follows:

the similarity in damages, Plaintiff contends that Defendant cannot pursue its fraud claims. To support its position, Plaintiff cites to several cases from other states. Plaintiff does not cite to any Georgia cases for its proposition. The Court finds that Plaintiff has not met its burden to show that, under the facts in this record, Defendant cannot pursue its fraud claims as a matter of law. Under Georgia law, a plaintiff often may pursue both fraud and contract claims and make the election only before entry of judgment. *Cf. Nalley Northside Chevrolet, Inc. v. Herring*, 215 Ga.App. 185, 450 S.E.2d 452 (1994); *Towery v. Massey*, 179 Ga.App. 61, 345 S.E.2d 90 (1986).

**30.** In its original Motion for Summary Judgment, Plaintiff argued that the underutilization charges

were an unenforceable penalty. By way of its reply brief, Plaintiff withdrew this prong of its argument in support of Plaintiff's Motion for Summary Judgment on Count Two of Defendant's Counterclaim.

**31.** The Court notes that Defendant MCI moves for the award of attorneys' fees and costs pursuant to the MCI Tariff for expenses incurred in collecting the balance Plaintiff owes Defendant. Since the Court finds that summary judgment is not available upon all of Count Two of Defendant's Counterclaim, the Court **DENIES** without prejudice Defendant's Motion for Summary Judgment for the award of attorneys' fees and costs.

[o]ne person may own all the stock of a corporation, and still such individual shareholder and the corporation would, in law, be separate and distinct persons.... the sole owner of a corporation may make himself liable in various ways, by fraud, by obtaining credit on his personal assumption of responsibility, etc.

*Byrd v. Brand,* 140 Ga.App. 135, 136, 230 S.E.2d 113 (1976). In offering to "be personally responsible for the indebtedness of IN-TEX," DeJoria was offering his services as a surety for any indebtedness incurred by Intex/Delaware. Defendant MCI may have a claim against DeJoria, but Defendant MCI has failed to offer any evidence that it has a claim for fraud against Intex/Delaware based upon the alleged representations made by DeJoria that he would "be personally responsible" on behalf of Intex/Delaware. Such a statement does not, as a matter of law, support a claim of fraud against Intex/Delaware the corporation. Therefore, the Court **GRANTS** Plaintiff's Motion for Summary Judgment [143–1] on Count Four of Defendant MCI's Counterclaim.

## X. *DEFENDANT MCI'S MOTION TO STRIKE GERARD AFFIDAVIT AND FOR EXPENSES AND ATTORNEYS' FEES*

Defendant requests that the Court strike the affidavit of Gary Gerard, and award attorney fees incurred as a result of pursuing this Motion. On November 30, 1994, Plaintiff filed a Notice of Withdrawal of the Affidavit of Gary Gerard. Therefore, the only issue is whether attorneys' fees should be awarded to Defendant. A brief summary of the events leading to the withdrawal of Gerard's affidavit is necessary.

On July 22, 1994, Plaintiff's counsel contacted Gerard regarding whether Gerard would sign an affidavit. Plaintiff's counsel faxed Gerard the affidavit. On July 24, 1994, Plaintiff's counsel again spoke with Gerard, and Gerard explained that he was unwilling to sign the affidavit in its present form. Gerard agreed to sign a revised version of the affidavit. On July 25, 1994, Plaintiff filed its Reply Brief to MCI's Motion for Summary Judgment and included the unsigned affidavit of Gerard. Plaintiff's counsel submits that the unsigned affidavit was offered based upon Gerard's willingness to sign the affidavit the day before.

A week passed and Plaintiff's counsel was unable to contact Gerard, despite repeated attempts. When Plaintiff's counsel did contact Gerard, Plaintiff's counsel was informed by Gerard that Gerard would not sign the affidavit unless Gerard's counsel said that Gerard should sign it. After discussing the matter with Gerard's counsel, plaintiff's counsel states that he understood that Gerard's counsel would advise Gerard to sign the affidavit. Nonetheless, Plaintiff's counsel was still unable to contact Gerard and verify that Gerard would sign the affidavit despite Plaintiff's counsel's efforts.

On September 14, 1994, Defendant filed a Notice of Objection to the affidavit of Gary Gerard, directing the Court's attention to the unsigned and unnotarized state of the affidavit. On September 21, 1994, Defendant noticed the deposition of Gerard. On October 13, 1994, MCI took the deposition of Gerard in California for purposes of establishing whether he had executed the affidavit. Gerard had not executed the affidavit and stated that he was not going to sign the affidavit. Intex still did not withdraw the Gerard affidavit.

On November 2, 1994, MCI filed its Motion to Strike the Affidavit and for Expenses and Attorneys' Fees. On November 30, 1994, Plaintiff filed its Response to the Motion to Strike and finally withdrew the affidavit. Defendant contends that it is entitled to the costs it incurred, including attorney fees, for challenging the unsigned affidavit of Gerard. Plaintiff's position is that once Defendant filed a Notice of Objection to the affidavit of Gerard that was unopposed by Plaintiff, there is no further obligation, absent a request by Defendant, for Plaintiff to withdraw the Gerard affidavit.

The Court finds that, under the facts herein, Plaintiff's counsel acted in bad faith and for purposes of delay by submitting this unsigned affidavit and particularly in not withdrawing the affidavit. To begin with, the practice of filing an unsigned affidavit is not the best procedure, but alone does not necessarily constitute bad faith or a delaying tactic. However, not withdrawing the affidavit

after three months passed, especially after the affiant did not return calls from Plaintiff's counsel and especially after Defendant's Notice of Opposition was filed in September, 1994, demonstrates bad faith and delaying conduct. Plaintiff's response that it did not oppose the Notice of Objection does not help. MCI could not rely on that Notice to resolve the whole issue. The Court would still be required to inquire into the matter, to review the affidavit, to review the Notice of Objection, to determine if a response was filed, and enter an Order striking it. It is abundantly clear here that Plaintiff's counsel should have withdrawn the affidavit long before and not caused Defendant MCI the expense of filing this Motion.

The Court **GRANTS** Defendant MCI's Motion to Strike the Gerard affidavit and awards expenses and attorneys' fees in favor of Defendant MCI and against Plaintiff Intex/Delaware. The affidavit of Defendant MCI's counsel refers only to total sums of attorneys' fees and expenses. The Court directs MCI's counsel to file, within 10 days of the date of this Order, an affidavit itemizing in detail the legal services and expenses related to the Gerard affidavit and Gerard deposition and covering the dates of the services or expenses, the hours spent on each date, billing rates per hour, and all individual itemized costs incurred. Plaintiff Intex/Delaware will have 10 days to respond. No extensions will be granted for either party.

## XI. *PLAINTIFF INTEX/DELAWARE'S MOTION TO REQUIRE DEFENDANT MCI TO SHOW CAUSE WHY IT SHOULD NOT BE HELD IN CONTEMPT*

In pursuing extensive discovery, Plaintiff Intex/Delaware has requested the identification of other telecommunications resellers and other lawsuits with telecommunications resellers involving MCI, and the Court ordered the production of such information. In response, Defendant MCI produced many documents, including names of almost 100 resellers, as well as information concerning numerous other lawsuits.

██ In December, 1994, Plaintiff Intex/Delaware learned from a third party about another lawsuit between a telecommunications reseller and MCI, which MCI had not disclosed to Plaintiff. Based on this discovery, Plaintiff Intex/Delaware seeks to reopen discovery, to have this Court order MCI to produce additional documents, and to hold MCI in contempt with sanctions.

After reviewing the record, the Court **DENIES** Plaintiff's Motion to Require Defendant MCI to Show Cause Why It Should Not Be Held In Contempt. First, discovery is long since closed, and this is an indirect method to reopen discovery and to relitigate discovery issues already litigated.

Second, there is a clear dispute among the parties as to whether the newly discovered lawsuit and documents related thereto were or were not covered by the discovery Orders and subsequent agreements between the parties. Plaintiff Intex/Delaware contends that they were, and Defendant MCI contends discovery was limited to lawsuits commenced prior to June 30, 1992, and only SCA's executed prior to June 30, 1992. This instant lawsuit was commenced in June, 1992, which would support this purported limitation. In any event, the Court is not required to resolve this factual dispute. The Court finds that each party has a reasonable factual basis for its version of discovery events and interpretation of discovery orders, precluding any finding of willful contempt.

Third, the discovery in issue relates to an SCA agreement between a third party and MCI. Plaintiff has not alleged or shown how not having this information has prejudiced its case. Fourth, the other discovery deficiencies complained about by Plaintiff have not been timely or properly raised at this late date.

## XII. *CONCLUSION*

Plaintiff's Motion for Partial Summary Judgment [143–1] is **GRANTED IN PART and DENIED IN PART,** as follows:

(a) The Court **DENIES** Plaintiff's Motion for Partial Summary Judgment [143–1] on the fraud claim in Count One of Defendant MCI's Counterclaim and on the underutilization penalties in Count Two of Defendant MCI's Counterclaim.

(b) The Court **GRANTS** Plaintiff's Motion for Partial Summary Judgment [143–1]

on the fraud claim in Count Four of Defendant MCI's Counterclaim.

Defendant MCI's Motion for Summary Judgment [144–1] is **GRANTED IN PART and DENIED IN PART,** as follows:

(a) The Court **GRANTS** Defendant MCI's Motion for Summary Judgment [144–1] on Count Three of Plaintiff's Complaint;

(b) The Court **GRANTS IN PART and DENIES IN PART** Defendant MCI's Motion for Summary Judgment [144–1] on Count Four of Plaintiff's Complaint. The only remaining claims in Count Four are Plaintiff's claims in item one for breach of contract based upon Defendant MCI's failure to connect Plaintiff's customers to the MCI network, and Plaintiff's claims for breach of contract based upon Defendant MCI's alleged improper termination of the SCA. Summary judgment is **GRANTED** in favor of Defendant MCI on all of Plaintiff's other contract claims in Count Four of Plaintiff's Complaint.

(c) The Court **DENIES** Defendant MCI's Motion for Summary Judgment [144–1] on Count Five of Plaintiff's Complaint.

(d) The Court **GRANTS** Defendant MCI's Motion for Summary Judgment [144–1] on Count Six of Plaintiff's Complaint.

(e) The Court **DENIES** Defendant MCI's Motion for Summary Judgment [144–1] on Count Seven of Plaintiff's Complaint.

(f) The Court **GRANTS IN PART and DENIES IN PART** Defendant MCI's Motion for Summary Judgment [144–1] on Count Two of Defendant MCI's Counterclaim.

Defendant MCI's Motion to Strike Affidavit [186–1] is **GRANTED.**

Defendant MCI's Motion for Expenses [186–2] is **GRANTED.**

Defendant MCI's Motion for Attorneys' Fees [186–3] is **GRANTED.**

Plaintiff's Motion to Require Defendant MCI to Show Cause Why It Should Not Be Held in Contempt [194–1] is **DENIED.**

This action is hereby specially set for trial on June 5, 1995. The parties shall file their Consolidated Pretrial Order on May 8, 1995.

Plaintiff shall provide Defendant with its portion of the Pretrial Order on April 21, 1995. Defendant shall provide Plaintiff with its portion of the Pretrial Order on April 28, 1995. The parties shall consolidate their respective portions and submit one Consolidated Pretrial Order no later than noon on May 8, 1995. Out of 250 cases, this is the third oldest civil case on the Court's docket, and no extensions of time for the Pretrial Order shall be granted. The Court schedules a Pretrial Conference on May 9, 1995 at 9:00 p.m. in Courtroom 2321.

**SO ORDERED.**